## Hanyok, Appellant, *v.* Pennsylvania Coal & Coke Corporation.

Argued April 18, 1944. Before KELLER, P. J., BALD-
RIGE, RHODES, HIRT, KENWORTHEY, RENO and JAMES, JJ.

*David L. Ullman,* with him *George Jerko,* for appel-
lant.

*Francis A. Dunn,* for appellee.

OPINION BY KELLER, P. J., July 15, 1944:

The Workmen's Compensation Act of 1915, P. L. **736**,
as amended by the Act of 1939, P. L. 520, which was
in force when the claimant's accidental injury occurred,
contains in section 306(e) the following provision: "If
the employee shall refuse reasonable surgical, medical
and hospital services, treatment, medicines and supplies,
tendered to him by his employer, he shall forfeit all
rights to compensation for any injury or any increase in
his incapacity shown to have resulted from such re-
fusal."

The meaning of this clause, as originally enacted [1]

---

[1] As originally enacted in 1915, the clause read in section

196

was passed upon by us and by the Supreme Court in *Neary v. Phila. & R. C. & I. Co.*, 69 Pa. Superior Ct. 562, and 264 Pa. 221, 107 A. 696. The Supreme Court, in affirming the judgment of this court, said: "...... the natural construction of the words 'shown to have resulted from such refusal' refer to 'any injury' as well as to 'any increase in his incapacity'. Chairman Mackey of the compensation board properly interprets this clause as though it read, 'If the employee shall refuse reasonable surgical, medical and hospital services, medicines and supplies, tendered to him by his employer, he shall forfeit all right to compensation for any increase in his incapacity shown to have resulted from such refusal'. The manifest purpose is to protect the master from any loss that might result because of the servant's refusal to accept the tendered assistance, not to penalize the latter ......"

It is clear that the act is not to be read as if it provided that the employee forfeited all rights to compensation *arising from his accidental injury* if he refused the employer's tender of reasonable surgical treatment, etc., but only proportionate compensation for so much incapacity or disability as was the result of his refusal to undergo the reasonable surgical treatment tendered by his employer.

The referee, the board, and the court below apparently misunderstood the situation in this respect. They may have been misled, to some extent, by an unfortunate and erroneous expression, which, somehow, slipped into our per curiam opinion in *O'Toole v. Hughes-Foulkrod Co.*, 113 Pa. Superior Ct. 292, 294, 173 A. 703. The sentence, which was not only not necessary for the deci-

---

306(e): "If the employe shall refuse reasonable surgical, medical and hospital services, medicines and supplies, tendered to him by his employer, he shall forfeit all right to compensation for any injury or any increase in his incapacity shown to have resulted from such refusal." The Act of 1939 adds the word 'treatment' to 'services, medicines and supplies'.

sion but was actually contrary to our ruling in *Parlo-vich v. Phila. & R. C. & I. Co.*, 76 Pa. Superior Ct. 86, cited by us in the O'Toole opinion, was: "The compensation, therefore, would cease if the medical attention was tendered to the employe by his employer and refused". There is no warrant in the law for the statement, and it is hereby disapproved. The compensation would *cease*, in the event of such a refusal, only if the medical or surgical treatment refused by the employee would have resulted in a complete restoration or recovery without *any* incapacity or disability due to the accident.

The claimant's left had was badly crushed in the accident—how badly may be seen from a brief statement of the attending surgeon: "The left hand was severely crushed. Specifically we noted the following conditions of that member: first, a compound comminuted fracture of second, third and fourth metacarpal bones in their dorsal one-third; second, extensive damage to the soft tissues; third, damage to the extensor tendons in the middle and ring fingers. They were crushed and frayed but not completely severed; fourth, damage to the blood vessels".

The treatment was described by him as follows: "We debrided the wound. Repaired the tendons by means of fine chrome steel wire sutures. Placed a Kirsdman wire transversely through the middle phalanx of index, middle and ring fingers for the purpose of maintaining traction, thus to overcome shortening of the metacarpal bones. The limb was encased in plaster of Paris in which was incorporated a metal strip for the purpose of traction; rubber bands were to be used ...... We were not able to maintain our traction. It became evident that the soft tissues would slough, and particularly the tendons, if traction was maintained. Hence, it was decided to loosen the traction and allow deformity of the bone to occur, but save the tendons."

Claimant was in the hospital from August 6 to August 30, 1941. He was a good patient, the doctor admits.

When the claimant came back in January, 1942, the doctor said "He had some little infection of the index, middle and ring fingers. The per cent of flexion, I would say at the time was not more than 25 per cent of normal. He had inability to adduct or abduct the fingers. He had obvious deformity of the metacarpal bones. X-ray examination disclosed that the heads, that is the dorsal end of each of the three metacarpals, are displaced palmar-wards. I believe that one of them was riding somewhat in between. They were all displaced and solidly united by bone in mal-position."

The second operation proposed by the doctor was to "refracture the second, third and fourth metacarpal and secure the fragments in proper position." ...... "I proposed to reduce those fragments, put them in proper apposition and whatever would be necessary, to do that. If you were to ask me, how are you going to do that, I would say, I just don't know. If we found a tendency for those fragments to slough we would again put on skeleton traction or we would endeavor to wire them together. There may be many ways to do that. You can wire fragments in position. You might find some of those fragments would be easily held in position, that is, without traction, and some you would have to put traction on".

The doctor did not say that the operation would entirely remove the existing disability of the hand; his expectation was that, if successful, it would result in considerable improvement, but he did not say how much or to what extent it would correct the disability, and the referee and the board made no finding on that point. On the other hand, the doctor admitted that without the operation, the hand might improve a little. He did not think it would get any worse. The improvement

would depend to a considerable extent on how much pull and how faithful claimant would be in trying to use it. With the operation, he thought there was a better than fair chance that the hand could be made useful; but as he said, he could not be sure, for he did not know whether the main intrinsic muscles of the hand were intact. He could not say, because he could not see under the skin.

There is no warrant whatever in the workmen's compensation law for *suspending* payment of compensation in these circumstances. Nor does the board have any authority to declare that the claimant has forfeited any part of his compensation, or to reduce the amount payable to him because of disability, until it has first found the extent or percentage of disability that would be corrected by the operation. Only to the extent of that finding can his compensation be affected.

And in deciding the question of the reasonableness of the operation, the board should consider the extent of the pain, suffering, inconvenience, etc., entailed by the operation in connection with the benefit that will probably result from it, whether the latter is such as reasonably to justify the former.

The order is reversed at the costs of the appellee; and the record is ordered remitted to the board for further hearing, consideration and determination in the light of this opinion.