Rohm and Haas Company, Petitioner *v.* Commonwealth of Pennsylvania, Workmen's Compensation Appeal Board and Norbert Frederick, Respondents.

Argued April 7, 1980, before Judges WILKINSON, JR., MENCER and ROGERS, sitting as a panel of three.

*David L. White,* with him *Michael P. McKenna,* for petitioner.

*Alvin M. Chanin,* for respondents.

OPINION BY JUDGE ROGERS, May 7, 1980:

Rohm and Haas Company, the employer of Norbert Frederick, has appealed from an order of the Workmen's Compensatioon Appeal Board affirming an award to Mr. Frederick for the permanent loss of his left eye as provided by Section 306(c)(7) of The Pennsylvania Workmen's Compensation Act, Act of June 2, 1915, P.L. 736, *as amended,* 77 P.S. §513(7).

On August 9, 1973 Mr. Frederick was splashed in the face with an unidentified but injurious chemical mixed with steam while in the course of his employment for Rohm and Haas as a utility operator. After a period of hospitalization for injuries to his eyes,

mouth and other parts of his face, he returned to his former work. In January 1974 Rohm and Haas filed a petition for termination or modification of an agreement for disability payments earlier executed and Mr. Frederick answered that his disability had not ceased and claiming compensation for the specific loss of his left eye.

Mr. Frederick presented at the referee's hearings the testimony of a board certified ophthalmologist, Dr. Kenneth I. Michaile, an associate surgeon at Wills Eye Hospital, Philadelphia. Dr. Michaile examined Mr. Frederick in January 1974 and on three later occasions. On the first visit, Dr. Michaile did a complete opthalmological examination which disclosed severe damage to the cornea of Mr. Frederick's left eye in the stromal layer, consisting of a scar in the lower midportion of the cornea. The stromal layer is the third of the five layers of the cornea counting from the surface. Dr. Michaile also found a condition of tenderness of the epithelium, the first layer of the cornea, and evidence of neovascularization, meaning the formation of new blood vessels on the cornea at the stroma. Examination also revealed that Mr. Frederick's right eye was uninjured and that in the right eye he had visual acuity of 20/20. Visual acuity in the left eye was 20/70 or 20/50, going to 20/40 with a pinhole, that is, tunnel type vision. Dr. Michaile concluded that Mr. Frederick had lost roughly 50 percent of the visual acuity of his left eye. As will be later mentioned, Mr. Frederick was found to have 20/20 visual acuity using both eyes but that he suffered discomfort when using both eyes.

On later visits to Dr. Michaile, Mr. Frederick had severe complaints of excessive photosensitivity in the left eye which sympathetically involved the right eye. This condition, which the doctor believes is permanent, causes such discomfort in the left eye as to require it

to be shielded to prevent tearing and closing. Nerves in both eyes cross and connect, as it were, in the back of the eyes, so that discomfort in one eye causes discomfort in the other. In Mr. Frederick's case, glare causing his left eye to tear and close has the effect of causing the right eye also to close. Dr. Michaile expressed the opinion that although Mr. Frederick has an uncomfortable 20/20 visual acuity with both eyes, he does not have satisfactory visual function with both eyes because of the glare phenomonem affecting the left eye. Dr. Michaile expressed the belief that Mr. Frederick in the presence of glare should shield or patch his left eye. At the conclusion of his direct examination, which an extensive cross-examination only served to amplify, Dr. Michaile testified as follows:

A. Well from the patient's history and from my observations of him, I felt that using both eyes with the glare phenomenon being so permanent in the left eye, the patient was actually getting poor [er] vision than if he used just the right eye alone and shielded off the left eye. In other words when the left eye had this excessive photo-sensitivity it sympathetically involved the right eye which caused the patient really to have poor[er] vision than if he used the right eye alone, or poor[er] visual function, let me put it that way; didn't change his visual acuity in that eye but visual function.

. . . .

Q. Well what do you mean by visual function doctor, is that the word you used?

A. Yes. By visual function I mean the ability of the patient really to not only see directly straight ahead but to see on the sides, to work under all different types of condition whether they be glare, smoke, pollution, in other words any of our normal activities or the nor-

mal activities which the patient finds in his oc-
cupation.

Q. Could this patient see better in general
using the injured left eye in connection with his
good right eye than by using the right eye
alone?

A. In my opinion he could see better using
the right eye alone.

Q. Are you saying that the left eye de-
tracted from his vision?

A. No I didn't say it detracted from his
vision, I said it disturbed his vision.

Q. What is your opinion with regard to the
permanence of the condition you've just de-
scribed?

A. I feel unfortunately it will be perma-
nent. I hope I'm wrong, I think it's unfortu-
nate, but I think it will be permanent.

Mr. Frederick testified that light or glare caused
his left eye to tear and close and his right eye, in sym-
pathy, to close for periods of from ten to fifteen min-
utes and that he cannot see as well using both eyes as
he can covering the left and using only the right.

Rohm and Haas had no medical evidence, its coun-
sel announcing at one of the referee's hearings that
Dr. Morton W. Richmond, Mr. Frederick's treating
physician, had made four written reports and that
"frankly I don't think Dr. Richmond and Dr. Michaile
diverge all that significantly". Rohm and Haas pro-
duced a plant foreman and another employee who tes-
tified that Mr. Frederick performs the same work as
he had before the accident—that of operating a tow
loader, a battery driven vehicle capable of moving
drums on pallets in and about his work place. These
witnesses further testified that Mr. Frederick, when
he first returned to work after being injured, wore
tinted or sun glasses but that he wore only conven-

tional eyeglasses after being warned that the use of colored glasses was a violation of safety rules. In rebuttal, Mr. Frederick said that he was able to work without shielding his left eye because the tow motors had cabs which reduced the glare and because he worked inside a building or in shaded areas adjacent to the building. He described an incident when he had to leave the immediate area of the plant facing the sun when, because of glare, both eyes closed for half an hour.

The referee, whose decision the Board affirmed, found:

4. Claimant's accident of August 9, 1973 caused a permanent scar in the lower middle portion of the third or stromal layer of his left cornea.

5. In his attempt to show the loss of use of his left eye, Claimant testified, and the Referee believes, that if Claimant is required to drive his towmotor out into the sunlight his eyes are forced closed due to a photosensitivity which developed as a result of his injury of August 9, 1973. The Referee has considered the testimony of Claimant's two co-employes, produced by Defendant, who stated that Claimant works without sunglasses or an eye patch over his left eye and rejects such testimony as having only slight relevance to the issue of specific loss (which is not to be confused with industrial loss) in light of Claimant's reasonable explanation that he works in a shaded area free of glare.

6. Following his return to work, Claimant's right eye was back to normal 20/20 vision, his left eye was seriously impaired, but the vision in his right eye was diminished when he used both of his eyes together.

7. The injury to Claimant's left eye has a sympathetic reaction upon his otherwise unimpaired right eye in that the photosensitivity of his left eye sympathetically causes a similar effect on the right eye.

8. The credible medical evidence in this case indicates that the Claimant actually has poorer vision using the sensitive left eye together with the right eye than if he were to use the right eye alone and shield the left eye.

9. Claimant has lost the use of his left eye for all practical intents and purposes.''

The record amply supports these findings and these findings clearly support the award.

The standard for use in determining whether compensation for the specific loss of an eye should be awarded where the eye has been injured but not destroyed, is that of whether the eye was lost for all practical intents and purposes. It will be held to be lost for all practical intents and purposes if the use of the injured eye does not contribute materially to the claimant's vision in conjunction with the use of the uninjured eye. *Hershey Estates v. Workmen's Compensation Appeal Board,* 9 Pa. Commonwealth Ct. 470, 308 A.2d 637 (1973) ; *Diaz v. Jones & Laughlin Steel Corporation,* 155 Pa. Superior Ct. 177, 38 A. 2d 387 (1944). Dr. Michaile's testimony, which Rohm and Haas tells us is not different from the views held by Mr. Frederick's treating physician, is that Mr. Frederick could see better when using his right eye alone; that his left eye disturbed his vision with both.

Order affirmed.

### Order

And Now, this 7th day of May, 1980, judgment is entered in favor of the claimant, Norbert Frederick, and the defendant Rohm and Haas Company is or-

dered to pay Mr. Frederick compensation for the loss of the use of his left eye at the rate of $100 per week for 275 weeks, commencing November 12, 1973, together with interest at the rate of ten percent per annum on all unpaid compensation due.