519 A.2d 1107

Joyce Western Corporation, Petitioner *v.* Workmen's Compensation Appeal Board (Fichtorn), Respondents.

Argued November 18, 1986, before President Judge CRUMLISH, JR., Judge Colins, and Senior Judge BARBIERI, sitting as a panel of three.

*Terry L. M. Bashline, Baginski & Bashline,* for petitioner.

*Leonard E. Price,* for respondent, William P. Fichtorn.

OPINION BY SENIOR JUDGE BARBIERI, January 15, 1987:

The issue presented to us in this workmen's compensation case is whether or not the referee, affirmed by the Workmen's Compensation Appeal Board (Board), properly awarded compensation to Claimant, William P. Fichtorn, for loss of vision of his right eye under Section 306(c)(7) of The Pennsylvania Workmen's Compensation Act (Act).[1]

Claimant was injured while an employee of Joyce Western Corporation, Petitioner, on November 23, 1977, when he sustained a blow to his right eye, for

---

[1] Act of June 2, 1915, P.L. 736, *as amended,* 77 P.S. §513(c)(7).

which he was paid compensation at the total disability rate from December 2, 1977 through January 10, 1978, on which latter date he returned to work without loss in earnings. The case arises on defendant's Petition to Terminate on which there have been three decisions by a referee and three reviews and orders on appeals by the Board. Although there was an effort by Petitioner to amend the Termination Petition to a Petition for Suspension, the ultimate decision, as noted by the referee, was the adjudication on the basis of the Termination Petition. Limited by stipulation to the sole issue as to the extent of lost vision, the referee found:

3. On or about May 15, 1979, defendant filed a Petition for Termination, which was later amended to be a Petition for Suspension and was later remanded to the Referee from the Appeal Board as a Remanded Termination Petition.

4. After various hearings, it was stipulated between the parties that the only issue for determination by the Referee was whether or not the claimant has lost the use of his right eye for all practical intents and purposes.[2]

---

[2] The following statements appear in the record of this case: MR. BOSAKOWSKI: Mr. Refere [sic], my name is James Bosakowsi [sic] and I represent the Defendant and Insurance Carrier in this case. I have had an extensive conversation with Mr. Heim [Counsel for Claimant] and we proposed to deal with this case in its entirety [sic] as follows: The Defendant moves to amend its Termination Petition to a Suspension Petition retroactive to the date of filing. Number two; *we stipulate that the only issue here is whether the Claimant has sustained a specific loss of his eye.* (Emphasis added.)
. . . .
MISS PRITZ: I think, Mr. Referee, *we can stipulate that the sole issue is whether or not the claimant has sustained loss of use of his right eye.* (Emphasis added.)
Miss Pritz was Employer's Counsel.

As regards the state of Claimant's vision in the injured eye, the referee found:

5. The deposition of Robert H. Yockey was taken on behalf of the claimant. Dr. Yockey, a Board Certified opthalmologist, testified that the claimant was developing a cataract and an adhesion of the iris in his right eye at the place of the original injury. His vision was 20/200, with best correction and that he had sustained an 'industrial vision loss'. The doctor stated that his vision could be restored if he underwent a cornea implant, but that there was some risk of losing all sight in that eye. The doctor stated the claimant was uninterested in the operation.

6. The deposition testimony of John M. Mikulla, M.D. was taken on behalf of the defendant. Dr. Mikulla, a Board Certified opthalmologist, [sic] had findings similar to those of Dr. Yockey. He did feel that there was a 95 percent chance of successfully removing the cataract and thus improving the claimant's vision. The doctor stated that uncorrected, the eye had no useful function.

In the controversy here are the following three findings:

7. After a careful review of the evidence, your Referee finds that while the claimant did sustain an injury to his right eye, which, uncorrected, has caused him to lose the use of said eye, the claimant could undergo surgery with only a minimal risk of failure which would restore sight to his right eye.

8. Your Referee finds that the claimant's specific loss has been caused by his own refusal to undergo corrective surgery.

9. Your Referee finds that the claimant's refusal to undergo corrective surgery is unreasonable

under the circumstances. However, your Referee does not have the power to order claimant to undergo surgery.

Finally, the last of the referee's findings, and the one specifically adopted by the Board, reads:

10.   Claimant has sustained a loss of use of his right eye for all intents and purposes as a result of said injury.

The referee's sole conclusion of law is as follows:

### CONCLUSIONS OF LAW

Claimant has lost the use of his right eye for all practical intents and purposes.

Both parties appealed, the Claimant assigning for error the referee's findings Nos. 6, 7, 8 and 9, quoted above; and the defendant in its appeal averring that "Claimant's specific loss of his right eye was caused by his own refusal to undergo corrective surgery but that the Referee has no power to order claimant to undergo surgery, and thus awarded claimant specific loss benefits," and "[t]his was an error of law, as Section 306(f)(4)[3] of the Act would bar compensation in such cases; that "[s]ince the Referee found that claimant's specific loss was correctible, said 'loss' is not permanent nor is it a specific loss, as a matter of law;" that "[t]he medical evidence of record only supports an 'industrial loss' which is not the proper standard to measure a specific loss," and that "[t]here is no evidence of record to support a finding that the injury resolved itself into a specific loss as of December 2, 1977."

---

[3] Section 306(f)(4), 77 P.S. §531(4), contains the following clause:

If the employe shall refuse reasonable services of duly licensed practitioners of the healing arts, surgical, medical and hospital services, treatment, medicines and supplies, he shall forfeit all rights to compensation for any *injury* or any increase in his incapacity *shown to have resulted from such refusal*. (Emphasis added.)

The Board, affirming, stated:

. . . .

The Appeals by both Parties have validity to the extent that: the Findings of Fact were indeed inconsistent with each other and that some were inconsistent with the Order; and Findings of Fact Nos. 7, 8, and 9 especially do not support the Order.[4]

Claimant, who won the Specific Loss award before the Referee, asserts in his Appeal on Brief that the Referee has made a number of unnecessary Findings and points out that Findings Nos. 7, 8, and 9 are surplusage and/or harmless error in that they are extraneous to the only point at issue. Finding of Fact No. 4 states that 'After various hearings, it was stipulated between the parties that the *only issue* for determination by the Referee was whether or not the Claimant has lost the use of his right eye for all practical intents and purposes.'

Finding of Fact No. 10 concludes that 'Claimant *has* sustained a loss of use of his right eye for all intents and purposes as a result of said injury.' This is a conclusive resolution of the sole issue in this case and that conclusion is amply supported by the expert testimony of opthalmologists who testified for each Party. The question of corrective surgery and the degree of risk of such surgery is not germane to the sole point at issue as stipulated to by both Parties. (Emphasis the Board's.)

---

[4] The Reproduced Record contains indications that the referee's apparently conflicting findings may have resulted from his adoption of conflicting requests for findings filed by the parties. R.R. 95a—97a.

We agree with the Board that the sole issue before it and before us, as agreed by the parties, is whether or not the Claimant has sustained the loss of his right eye for all practical intents and purposes, and that the other questions presented before the Board and here are not properly subject to review. First of all, as noted, the sole petition before the referee was for termination or, possibly, for a suspension. There is no petition presented seeking the sanction of non-payment for refusal of "reasonable services" under Section 306(f)(4). In fact, there is no offer on the part of the employer of the services which it contends here had been refused by the Claimant. Furthermore, a forfeiture of compensation that is otherwise payable is only as to "compensation for any *injury* or *any increase* in [claimant's] incapacity *shown* to have *resulted from such refusal.*" (Emphasis added.)[5] Section 306(f)(4) of the Act. In short, we agree with the Board that we do not have before us a properly presented issue under Section 306(f), and while permanence may be a factor in establishing the right of recovery for a specific loss under Section 306(c), lack of such permanence, to the knowledge of this writer, has never been predicated upon the refusal of medical or surgical intervention where this has been refused by the employee.[6]

---

[5] In *Hanyok v. Pa. Coal & Coke Corp.,* 155 Pa. Superior Ct. 194, 38 A.2d 537 (1944), the Court stated:

It is clear that the act is not to be read as if it provided that the employee forfeited all rights to compensation *arising from his accidental injury* if he refused the employer's tender of reasonable surgical treatment, etc., but only proportionate compensation for so much incapacity or disability as was the result of his refusal to undergo the reasonable surgical treatment *tendered by his employer.* (Emphasis added.)

155 Pa. Superior Ct. at 196, 38 A.2d at 538.

[6] The cases of *Visnic v. Westmoreland Coal Company,* 155 Pa. Superior Ct. 199, 38 A.2d 539 (1944) and *Hanyok v. Pa. Coal &*

Petitioner contends that the Board has ruled that the question of whether or not surgery would be successful in restoring sight had been waived by Petitioner by virtue of the stipulation. We do not agree with Petitioner's reading of the Board's comment. In our view, the Board was simply ruling that a question as to the reasonableness of the suggested surgery was not in issue, having been eliminated by the stipulation.[7]

In any event, we must agree with the Board's determination that the testimony of both ophthalmologists in this case clearly supports the finding that Claimant suffered the compensable loss of vision and use of his right eye within the meaning of Section 306(c)(7). While it is true, as Petitioner points out, that Dr. Robert H.

_____

*Coke Corp.,* 155 Pa. Superior Ct. 194, 38 A.2d 537 (1944) relied upon by Petitioner, are clearly inapplicable. In *Visnic,* the claimant removed a leg brace, re-broke his leg, eventually requiring amputation, but the Court stated that if claimant had refused the brace in the first place, "it would be but a mere whim to reduce or withhold compensation;" and in *Hanyok,* unlike in this case, the issue of refusal of surgery was properly before the compensation authorities and the Court, but the Court did not terminate benefits; instead remanded the case with the following admonition:

> And in deciding the question of reasonableness of the operation, the board should consider the extent of the pain, suffering, inconvenience, etc., entailed by the operation in connection with the benefit that will probably result from it, whether the latter is such as reasonably to justify the former.

155 Pa. Superior Ct. at 199, 38 A.2d at 539.

In any event, we have held that even if the refusal of surgery is unreasonable "the employer would still have had the burden of proving that the refusal led to further injury or to an increase in the claimant's incapacity. . . ." *Muse v. Workmen's Compensation Appeal Board (Western Electric Co.),* 89 Pa. Commonwealth Ct. 171, 104, 492 A.2d 102 (1985). Here, of course, we have no proof that the alleged refusal, if there was one, either caused "further injury" or "an increase in claimant's incapacity."

[7] See Footnote 2, *supra.*

Yockey stated, at one point in his deposition, that the visual acuity found by him at the time of his examination, 20/200 was "an industrial vision loss," reflected in the quotation in the referee's fifth finding of fact, Dr. Yockey also testified as follows:

Q. Do I understand the claimant can use his right eye for various tasks around the house or the right eye does assist the left eye on certain tasks, is that correct?

A. To a limited degree, probably, except I don't know what tasks you're talking about, as far as being able to do. If he shuts his left eye, he's not going to be able to do anything fine at all. Can't read.

Q. Well, I understand that, Doctor, but I'm saying, such as the every day getting dressed, driving a car, planting a garden.

A. He can't drive with his left eye closed.

Q. I know, but does the right eye assist his left eye during these normal everyday activities?

A. Maybe to a very limited extent.

He also testified:

Q. Well, you indicated he could see objects, but do no fine work, not read, and, in essence, what would he be able to see with his left eye closed?

A. He could probably walk around and not bump into things, but with twenty-two hundred vision he would be almost helpless, as far as doing any task or work of any kind.

As regards the suggested surgery, a cataract extraction, the Doctor testified:

Q. And was there anything further you could do for him did you feel, at that point, to correct—

A. The only thing that could be done for him was a cataract extraction, *might* improve his vision. (Emphasis added.)

. . . .

Q. Doctor, did you recommend any corrective lenses to the claimant?

A. We couldn't improve his vision with corrective lenses to be of any value.

Petitioner's ophthalmologist, John M. Mikulla, M.D., gave testimony that not only supported that of Dr. Yockey, but showed even less useful vision, as follows:

Q. And in terms of the 8/200 level that you found, what does this say? Does he have some ability to see out of his right eye?

A. Okay. He has vision in that eye. 8/200 basically represents that, you know, if we had a size letter that he could just barely tell me what it was eight feet away from that letter, okay, the normal person would be able to read that letter two hundred feet away. So his vision is severely limited and is *in the range of legal blindness* in that eye. (Emphasis added.)

But he does have peripheral vision, which means that he can walk around with that eye and negotiate stairs and walk through the room, especially with practice.

. . . .

Q. All right. And in your earlier testimony, I believe you said that he had legal blindness of the right eye as of the time you saw him in '82?

A. I'm using the definition of 20/400 best corrected vision as being a definition of legal blindness, and this man's vision is worse than 20/400.

Q. Dramatically worse than 20/400, isn't it?

A.   You know, 8/200 is really 16/400, so it's worse than 20/400. It's not twice as bad, but it is worse. He is definitely legally blind at this point.

Q.   And really, for all practical intents and purposes, Mr. Fichtorn has lost the use of that injured right eye, isn't that so?

A.   In the state in which I examined him, that eye as it sits right now has no useful function in terms of performing normal day-to-day activities. It does provide him some peripheral vision but not useful vision to read or write or to really function, unless something is done to attempt to rehabilitate that eye.

Q.   If he were to, for example, close his left eye or put a patch over his left eye and try to do things in the normal way of life with the injured right eye, he would have severe difficulties and problems, wouldn't he?

A.   Absolutely.

Q.   As for driving and looking at people across the room or looking at television, walking up steps, and things of that sort, he would have extreme difficulty?

A.   Extreme difficulty.[8]

We note that mere loss of peripheral vision has been held by this Court to be insufficient to disqualify a loss of use award. *Miller v. Workmen's Compensation Appeal Board (Certainteed Corp.)*, 91 Pa. Commonwealth Ct. 253, 496 A.2d 1337 (1985). *See Fidler v. Workmen's*

---

[8] In light of the medical testimony in this case, it might well fall within the ambit of those cases where using the eyes together is more likely to be adverse than providing a material contribution to the vision of the uninjured eye. *Steele v. Workmen's Compensation Appeal Board*, 36 Pa. Commonwealth Ct. 352, 387 A.2d 1339 (1978); *Hershey Estates v. Workmen's Compensation Appeal Board*, 9 Pa. Commonwealth Ct. 470; 308 A.2d 637 (1973).

*Compensation Appeal Board (United Cable Corp.)*, 83
Pa. Commonwealth Ct. 155, 478 A.2d 907 (1984); and
an award where visual acuity after injury was 20/400
was sustained in *Thiele, Inc. v. Workmen's Compensa-
tion Appeal Board (Sulosky)*, 83 Pa. Commonwealth Ct.
286, 477 A.2d 51 (1984): and even an achieved acuity
following injury of 20/50 did not disqualify an award
where there was discomfort experienced when using
both eyes. *Rohm and Haas Company v. Workmen's
Compensation Appeal Board (Frederick)*, 51 Pa. Com-
monwealth Ct. 184, 414 A.2d 163 (1980). In justifica-
tion of Claimant's apparent disinterest in cataract
surgery, there is the further testimony of Dr. Mikulla,
as follows:

. . . .

A. It can occur. Sympathetic ophthalmia in
this man could occur from the actual injury to
his left eye—I mean to his right eye. The left
eye could develop inflammatory conditions be-
cause of the injury to the right eye.

. . . .

Q. And to properly give these people their
rights of informed consent or to know what cata-
ract surgery holds for them, the benefits and the
liabilities, do you explain these things to them as
you have explained them to me?

A. We discuss the risk of infection, of hem-
orrhage, complications with the retina, and the
potential of glaucoma as being a small statistical
but real risk. The way I describe it to my
patients, it doesn't matter whether it is three
percent or five percent, if it's you, it's one hun-
dred percent.

Q. Absolutely.

A. So they have to weigh that in their
mind.

Finally, we conclude that the award in this case must be sustained since the tests as synthesized in *Hershey Estates v. Workmen's Compensation Appeal Board,* 9 Pa. Commonwealth Ct. 470, 308 A.2d 637 (1973), and reconfirmed in *Thiele* for the allowance of such an award have been adequately met in the record of this case. In *Thiele,* we stated:

> The standard for determining whether compensation for the specific loss of an eye should be awarded where the eye has been injured but not destroyed, is as follows:
>
> [W]hether the injured eye was *lost for all practical intents and purposes,* not whether claimant in fact has vision in the injured eye. [If so, compensation follows.] In facilitation of the application of the ultimate test, a further standard has been adopted: Compensation may not be had if, using both eyes, the claimant can see better, in general, than by using the uninjured eye alone . . . or, as otherwise stated, there may be compensation if the use of the injured eye does not *contribute materially* to the claimant's vision in conjunction with the use of the normal eye. . . .
>
> Hershey Estate v. Workmen's Compensation Appeal Board, 9 Pa. Commonwealth Ct. 470, 473, 308 A.2d 637, 639 (1973) (emphasis added).

83 Pa. Commonwealth Ct. at 288, 477 A.2d at 52.
For the reasons stated, we will affirm.

ORDER

Now, January 15, 1987, the order of the Workmen's Compensation Appeal Board, as of No. A-89524, dated November 8, 1985, is hereby affirmed.